RODDY LYLES, as Executor of the
Estate of Pat Lyles, *et al.*,                                                        Plaintiffs,

v.

RDP COMPANY, *et al.*,                                                        Defendants,

* * *

RDP COMPANY,                                                        Third-Party Plaintiff,

v.

MARTIN MARIETTA MATERIALS, INC.,                        Third-Party Defendant,

* * *

RDP COMPANY,                                                        Crossclaimant,

v.

LAFARGE WEST, INC.,                                                        Crossclaim Defendant,

* * *

LAFARGE WEST, INC.,                                                        Crossclaimant,

v.

RDP COMPANY,                                                        Crossclaim Defendant.

## MEMORANDUM OPINION

The Story family filed this action against RDP Company and Lafarge West, Inc., alleging various claims arising out of, or connected to, a mineral rights lease dating back to 1977. With discovery at an end, the Storys, RDP Company, and Lafarge West filed competing motions for summary judgment. (To the extent RDP Company prevails,

1

Martin Marietta Materials, Inc., whom RDP Company impleaded, seeks summary judgment too.)  For reasons discussed at length below, the Storys' Motion for Summary Judgment, R. 78, is **DENIED**, and RDP Company's Motion for Summary Judgment, R. 77, Martin Marietta Materials, Inc.'s Motion for Summary Judgment, R. 79, and Lafarge West, Inc.'s Motion for Summary Judgment, R. 81, are **GRANTED**.

## I.

## A.

## 1.

Between 1967 and 1977, the Story family executed three leases granting Fredonia Valley Quarries, Inc. the right to quarry "all merchantable limestone rock and other kindred substances in, under and upon" a one-hundred and thirty-two acre tract of land in Caldwell County, Kentucky.  R. 84-1 at 2 (1967 Lease); *id.* at 7 (1972 Lease); *id.* at 12 (1976 Lease).

*The 1967 Lease.*  The patriarch of the Story family, Jewell Story, signed the first lease on July 31, 1967.  *See* R. 81-4 at 5.  In some detail, the lease granted to Fredonia Valley Quarries

> the right and license to enter upon the premises hereinbefore described at all times and to use so much of the surface thereof as in the opinion of [Fredonia Valley Quarries] may be reasonably necessary in searching for and exploring for limestone rock and other kindred substances and in determining the thickness thereof, and for the establishment of quarries, including mining and processing equipment, and for the deposit of waste material from such quarries; also the right and license to quarry and remove said limestone and/or other kindred substances from said premises, together with the rights, privileges, license and easements to do any and all things necessary, incidental or in any manner appertaining to the proper prosecution of the business of quarrying and removing said limestone and other kindred substances and the further processing of the same into products of all descriptions; also, the right of way for necessary roads over said premises, and the right to occupy as much of the surface of

2

said premises as may be reasonably necessary for the storing of said limestone rock and other kindred substances, and depositing the refuse therefrom and the right to erect on said premises such buildings, structures and fixtures as may be necessary or incidental to the proper prosecution of said business, all of the foregoing to be located (or relocated from time to time) on or over such portions of the premises as [Fredonia Valley Quarries], in its sole discretion, may from time to time determine.

*Id.* at 2–3. The lease reserved to the Storys "all cedar timber on the premises," provided that the Storys timely removed such timber so as to avoid delaying or interfering with Fredonia Valley Quarries' operation. *Id.* at 4.

In exchange, the lease guaranteed the Storys a minimum payment of $40.00 per month without regard to whether Fredonia Valley Quarries quarried the Storys' tract. *Id.* at 3. Once Fredonia Valley Quarries began excavating the Storys' land, it agreed to pay them a production royalty of 5¢ per ton for the first 2,000 tons of limestone, and of 3¢ for each ton thereafter, removed during any particular month, less the guaranteed minimum payment of $40.00. *Id.* The lease granted an option to Fredonia Valley Quarries to "install a plant site and/or railroad facilities" on a portion of the tract in exchange for an additional $150.00 per month "for each and every month [the lease] is in force." *Id.* at 4.

The initial term of the lease was for five years with an option to renew in perpetuity if Fredonia Valley Quarries "well and truly kept and performed . . . all the stipulations, covenants and agreements" in the lease. *Id.* Fredonia Valley Quarries reserved the right to terminate the lease "at the end of any month upon written notice to the [Storys] and the payment" of $250.00. *Id.* If Fredonia Valley Quarries failed to pay the "minimum royalty for a period of six consecutive months," the Storys retained the right to declare "a forfeiture of [the] lease." *Id.* at 5.

*The 1972 Lease.* Jewell Story passed away on January 5, 1970. *See* R. 78-2 at 15 (Charles Story's Deposition Excerpt). He devised the tract in equal parts to his son,

Charles S. Story; to his daughter, Janice N. Cope; and to Pat N. Lyles, Charles and Janice's half-brother. *See* R. 81-2 at 40 (Charles Story's Deposition Excerpt); R. 81-3 at 16–17 (Janice Cope's Deposition Excerpt). On August 7, 1972, Charles, Janice, and Pat (along with their spouses) executed a second lease identical in all respects to the lease signed in 1967. *Compare* R. 81-4 at 7–11, *with id.* at 2–6.

*The 1977 Lease.* The same group executed the third and operative lease with Fredonia Valley Quarries on August 1, 1977. *See id.* at 15. The third lease granted to Fredonia Valley Quarries

> the right and license to enter upon the premises hereinbefore described at all times and to use so much of the surface thereof as may be reasonably necessary in searching for and exploring for limestone rock and other kindred substances and in determining the thickness thereof, and for the establishment of Quarries and Quarry building and for the deposit of waste material from such quarries; also the right and license to quarry and removed said limestone and/or kindred substances from said premises together with the rights, privileges, license and easements necessary, incidental or in any manner appertaining to the proper prosecution of the business of quarrying and removing said limestone and other kindred substances; also the right of way for necessary roads and railroads over said premises, and the right to occupy so much of the surface of said premises as may be reasonably necessary for the storing of said limestone rock or other kindred substances, and depositing the refuse therefrom, and the right to erect on said premises such buildings, structures and fixtures as may be necessary or incidental to the proper prosecution of said business of quarrying.

*Id.* at 13. Similar to the prior leases, the third lease reserved to the Storys the "right to all timber cut by [Fredonia Valley Quarries] on the premises in the course of operation." *Id.* at 14.

In return, the third lease guaranteed the Storys a minimum royalty payment of $40.00 per month, excluding the months from December to April unless the quarries operated during those months. *Id.* at 13–14. It also provided a production royalty of 7.5¢ per ton for the first 4,000 tons of limestone, and of 4.5¢ for each ton thereafter, removed

during any particular month. *Id.* Unlike the prior leases, the third lease further obligated Fredonia Valley Quarries "to deliver to [the Storys] at the Quarries, fifteen ton[s] (15) of agricultural lime each year for and during the life of [the] lease, free of any cost." *Id.* at 14.

Again, the initial term of the third lease was five years, with an option to renew:

It is mutually agreed by the parties hereto that this lease shall run for five (5) years from and after this date and if all the stipulations, covenants and agreements herein contained have been well and truly kept and performed by the [lessee] as herein provided, this lease may be renewed according to the terms hereof and for the same consideration for five (5) additional years and at intervals of five (5) years thereafter for a period not exceeding ninety nine (99) years, and so long as said conditions have been kept and performed.

*Id.* If the lessee failed either "to operate the Quarries or to pay rent for a period of ninety (90) days," the Storys retained the right to declare "a forfeiture of [the] lease." *Id.* Other than that, the lease did not include any provision allowing the lessee to terminate the lease prior to expiration. *See id.* at 12–15.

## 2.

Sometime between 1977 and 1986, Fredonia Valley Quarries, Inc. merged with Basic Incorporated. *See* R. 77-5 at 70–72 (Hastie's Deposition). Under Basic Incorporated's management, the quarry fell into a state of unprofitability and "disarray." *Id.* at 75–76. In exchange for $450,000, *see id.* at 75–76, Basic Incorporated assigned the quarry (including the third lease) on January 28, 1986 to Rock Dust Products, a general partnership consisting of Denny and Simpson Stone Company, Inc., Rigsby and Barnard Quarry, Inc., and Hastie Mining and Trucking Company, *see id.* at 29–30.

Within the following six months, Rock Dust Products invested roughly $2,000,000 in new equipment to make operating the quarry feasible. *Id.* at 76. Over the

next eleven years, Rock Dust Products operated the quarry with around twenty employees.  *See id.* at 35–37, 75–77.  During that time, Rock Dust Products reinvested any net income from the quarry back into the operation.  *See id.* at 75–77.

Then, on May 5, 1997, Rock Dust Products assigned the quarry (including the third lease) to RDP Company.  The same day, RDP Company subleased the quarry to Martin Marietta Materials, Inc.  *See* R. 26-4 at 17, ¶ 5 (Short Form of Lease and Sublease Agreement); R. 78-13 at 1 (Master Lease and Sublease Agreement).  Under the sublease, Martin Marietta agreed to pay RDP Company a royalty of 30.33¢ per ton of limestone mined until April 30, 2007, followed by a royalty of 30.33¢ per ton, or 4.5% of Martin Marietta's weighted average retail price per ton, whichever is greater, until April 30, 2027.  R. 78-13 at 9–10, § 3.2.  RDP Company remained responsible for paying all rents, royalties, unmined mineral taxes, and such other expenses related to the subleased tracts from its own royalty.  *Id.* at 5, § 2.5.  Martin Marietta assigned the sublease to Lafarge West, Inc., the present quarry operator, on December 9, 2011.  *See* R. 47 at 5, ¶ 12 (Third Amended Complaint).  Lafarge West has operated the quarry since that time.

Generally speaking, Lafarge West quarries limestone through a process of drilling holes and then detonating a "shot" to blast limestone and other rock from the wall of the open-pit quarry to the bottom of the pit for extraction.  *See* R. 78-14 at 23 (Fernow's Deposition Excerpt).  Once liberated from the rock face, Lafarge West extracts the loose material from the pit with machinery and transports it to the primary crusher.  *See id.*

Occasionally, the drilling and blasting process dislodges boulders too large to process through the primary crusher.  *See* R. 78-14 at 23–24; R. 81-8 at 37–38 (Champion's Deposition Excerpt).  Lafarge West segregates those boulders until it makes

sense, economically, to rent a secondary breaker to reduce them to a manageable size, which is usually every six months to two years. *See* R. 78-14 at 23–24; R. 81-8 at 37. Once reduced to a manageable size, though, the boulders are processed through the primary crusher. *See* R. 78-14 at 23–24; R. 81-8 at 37. Lafarge West calculates the amount of the royalty owed based on the weight of the material processed through the primary crusher. *See* R. 78-14 at 23–24; R. 81-7 at 29–32 (Fernow's Deposition Excerpt); R. 81-8 at 33–34.

### 3.

The Storys' tract is just one of many parcels of land which comprise the Fredonia Valley Quarry. From at least 1967, the Storys have farmed the tract of land at issue, growing row crops and grazing cattle. R. 77-3 at 17–19 (Charles Story's Deposition Excerpt). Jewell Story farmed the tract until his death in 1970, and Charles Story began actively farming the land around 1995. *Id.* at 19. He continues to farm the ninety acres of unmined land to the present day. *Id.* at 18–19.

Charles Story lives about a half-mile from the quarry, which is just over a rise from his house. *See id.* at 8–9. He has lived there since 1957. *Id.* Before filing this action in 2014, Charles would visit the quarry around once a month. *See id.* at 106–08. By Charles' estimate, he has been to the quarry hundreds of times over the past thirty years. *See id.* at 107–08.

During that time, Charles has watched the quarry operator (whether Rock Dust Products or RDP Company or Lafarge West) use the Story tract in conjunction with quarrying operations on adjacent properties. For the last twenty to twenty-five years, Charles observed the quarry operator stockpile topsoil and deposit waste rock extracted

from adjacent properties on the Story tract. *See id.* at 66–72. He also watched as various haul roads, which he knew were used to support quarrying operations elsewhere, were constructed on his land. *See id.* at 75–77. Charles complained to Vernon Gilliand, the quarry manager, about such practices shortly after observing them around 1990. *See id.* at 68–72, 77–78. But Gilliand rebuffed Charles: The quarry operator he "could do what [it] want[ed] to do," *id.* at 78, and it has.

No less than fifteen years ago, Charles stood by as an office building and parking lot, along with a communications tower and set of scales, were constructed on the Story tract. *See id.* at 78–79, 84; *see also* R. 78-10 at 38–39 (Fernow's Deposition Excerpt). The quarry operator continues to stockpile, on the Story tract, topsoil reclaimed from multiple properties in accordance with the requirements of its mining permit. R. 78-11 at 10 (Fernow's Deposition Excerpt). It still deposits waste rock into an old mining pit, the majority (if not all) of which is located on the Storys' land, too. R. 78-10 at 37–38. To the present day, the quarry operator utilizes a number of roads on the Story tract to access its mining operations on, and to haul limestone and waste rock excavated from, other adjacent properties. *See id.* at 37; R. 78-11 at 10–11.

Despite that, the Storys continued to cash each royalty check sent to them through August 2013. *See* R. 77-3 at 169; R. 77-6 at 39 (Cope's Deposition Excerpt). The Storys ceased cashing those checks in September 2013, shortly before filing this action. *See* R. 77-3 at 169; R. 77-6 at 39.

## B.

Pat N. Lyles, Janice N. Cope, Charles S. Story, and Cindy Story, his wife, filed this action against RDP Company, Martin Marietta Materials, Inc., and Lafarge West,

Inc. in Caldwell County Circuit Court on December 30, 2013.[1]  *See* R. 1-1 at 4 (Complaint).  The Storys bring claims for, *inter alia*, breach of contract, forfeiture of the lease, ejectment, unjust enrichment, statutory waste, common-law unreasonable restraint on alienation, reformation of the lease, declaratory judgment, and willful trespass.  *See* R. 47 at 8–18, ¶¶ 27–59.[2]  Relying on 28 U.S.C. § 1332, RDP Company, Martin Marietta, and Lafarge West removed that action to this Court under 28 U.S.C. § 1441(a).  *See* R. 1 at 1, 5 (Notice of Removal).

Soon after, Martin Marietta asked the Court to dismiss all claims against it, *see* R. 6 at 1 (Motion to Dismiss), a request the Court granted on September 19, 2014, *see* R. 13 at 3–5 (Memorandum Opinion).  However, RDP Company impleaded Martin Marietta back into the fold, asserting claims for common law and contractual indemnity, breach of contract, negligence, gross negligence, and willful misconduct.  *See* R. 26 at 7–9, ¶¶ 30–45 (Third-Party Complaint).  In addition, RDP Company and Lafarge West crossclaimed against one another.  *See* R. 28 (RDP Company's Crossclaim); R. 46 (Lafarge West's Crossclaim).

Now, RDP Company and Lafarge West ask the Court to grant them summary judgment against the Storys.  *See* R. 77 at 1 (RDP Company's Motion for Summary Judgment); R. 81 at 1 (Lafarge West's Motion for Summary Judgment).  The Storys make a competing claim against RDP Company and Lafarge West.  *See* R. 78 at 1 (Storys' Motion for Summary Judgment).  To the extent RDP Company is successful,

---

[1] Pat Lyles passed away on September 1, 2015.  *See* R. 60 at 1 (Motion to Substitute).  Pursuant to Fed. R. Civ. P. 25(a)(1), the Court substituted Roddy Lyles as the Executor of the Estate of Pat Lyles in the late-Pat Lyles' stead.  *See* R. 61 at 1–2 (Order of January 12, 2016).

[2] To the extent the Storys failed to brief or mention any of these causes of action, such as its common-law claim for unreasonable restraint on alienation, the Court considers them to be abandoned.

Martin Marietta moves for summary judgment too.  *See* R. 79 at 1–2 (Martin Marietta's Motion for Summary Judgment).

## II.

Summary judgment is appropriate when the record, viewed in the light most favorable to the nonmoving party, reveals "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A genuine dispute of material fact exists where "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).  The Court "may not make credibility determinations nor weigh the evidence when determining whether an issue of fact remains for trial."  *Laster v. City of Kalamazoo*, 746 F.3d 714, 726 (6th Cir. 2014) (citing *Logan v. Denny's, Inc.*, 259 F.3d 558, 566 (6th Cir. 2001); *Ahlers v. Schebil*, 188 F.3d 365, 369 (6th Cir. 1999)).  "The ultimate question is 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'"  *Back v. Nestlé USA, Inc.*, 694 F.3d 571, 575 (6th Cir. 2012) (quoting *Anderson*, 477 U.S. at 251–52).

When the parties have filed competing motions for summary judgment, as is the case here, the Court "must evaluate each motion on its own merits and view all facts and inferences in the light most favorable to the nonmoving party."  *Hensley v. Grassman*, 693 F.3d 681, 686 (6th Cir. 2012) (quoting *Wiley v. United States*, 20 F.3d 222, 224 (6th Cir. 1994)).  The moving party must shoulder the burden of showing the absence of a genuine dispute of material fact as to at least one essential element of the nonmovant's claim or defense.  Fed. R. Civ. P. 56(c); *see also Laster*, 746 F.3d at 726 (citing *Celotex*

*Corp. v. Catrett*, 477 U.S. 317, 324 (1986)).  Assuming the moving party satisfies its burden of production, the nonmovant "must—by deposition, answers to interrogatories, affidavits, and admissions on file—show specific facts that reveal a genuine issue for trial."  *Laster*, 746 F.3d at 726 (citing *Celotex Corp.*, 477 U.S. at 324).  With its task appropriately framed, the Court turns to the merits.

## III.

In this action, the Storys maintain a number of claims against RDP Company and Lafarge West, Inc., such as for breach of contract, for trespass, and for waste.  Ultimately, though, the Storys seek a declaration that the mineral rights lease between them and RDP Company has not been renewed, has been terminated, or is unconscionable and ought to be reformed.  Upon careful consideration, and for the reasons discussed in more detail below, the Court finds the Storys' manifold theories to be meritless.  Accordingly, RDP Company and Lafarge West (as well as Martin Marietta Materials, Inc.) are entitled to judgment as a matter of law.

## A.

In the main, the Storys claim that RDP Company and its sublessees are nothing more than holdover tenants under Ky. Rev. Stat. § 383.160.  *See* R. 78-1 at 21–23 (Memorandum in Support of Storys' Motion for Summary Judgment).  To arrive at that conclusion, the Storys make two separate arguments.  First, the Storys say that the lease provided a right to *renew*, but not to *extend*, the lease—a right neither RDP Company nor its predecessors-in-interest exercised.  *See* R. 78-1 at 8–11; R. 98 at 5–9 (Reply to Lafarge West); R. 99 at 2–5 (Reply to RDP Company).  Second, the Storys submit, even if RDP Company and its predecessors-in-interest had an option to extend the lease,

neither satisfied the conditions precedent to exercising that right. *See* R. 78-1 at 11–21; R. 98 at 9–13; R. 99 at 6–13. The Court disagrees on both scores.

### 1.

Kentucky law has long recognized two kinds of rights allowing a lessee to prolong a tenancy. The first is a "right of renewal," which "connotes that a new, formal agreement in writing [will] be executed by the parties . . . or, at the least, [that] some positive act other than a mere holding over beyond the fixed term [will] be taken." *Lexington Flying Serv. v. Anderson's Ex'r*, 239 S.W.2d 945, 946 (Ky. 1951). The second is a "right of extension," which generally requires only that the lessee hold over in order to exercise the "option or privilege 'to extend.'" *Klein v. Auto Parcel Delivery Co.*, 234 S.W. 213, 214 (Ky. 1921). To determine which type of right that a lease contemplates, courts look to "[1] the language the lease uses to describe the right, [2] the intent of the parties as manifested by other terms in the lease, and [3] the parties' conduct before the controversy arose." *1651 N. Collins Corp. v. Lab. Corp. of Am.*, 529 F. App'x 628, 633 (6th Cir. 2013) (citing *Klein*, 234 S.W. at 215).

Here, the Storys say, RDP Company has nothing more than a right to renew the lease. *See* R. 78-1 at 8–11; R. 98 at 5–9; R. 99 at 2–5. Respectfully, the Court disagrees. Though the lease uses the term "renew," it contemplates a right to extend the lease term by "well and truly" keeping and performing "all [of] the stipulations, covenants and agreements" in the lease. R. 81-4 at 14.

As the Storys point out, the lease uses the term "to be 'renewed,'" as opposed to "'extend' or [to be] 'extended.'" R. 78-1 at 8; *see also* R. 81-4 at 14. True enough, the use of the word "renew" has at least *some* significance. *See 1651 N. Collins Corp.*, 529

F. App'x at 633 ("The language of the original lease agreement . . . provides for an 'option to renew,' suggesting the parties believed at the time of the original lease that separate agreements to prolong the lease would be needed."). However, the inclusion of that term is often not, standing alone, dispositive. *See Klein*, 234 S.W. at 215 ("[T]he privilege may thus be construed as one to 'extend' the term, although the language employed is one 'to renew' it."); *Kozy Theater Co. v. Love*, 231 S.W. 249, 251 (Ky. 1921) (same); *1651 N. Collins Corp.*, 529 F. App'x at 633 (same). Instead, the word "'renew' will not be given its strict legal interpretation, unless it is evident from some provision of the lease, or from the conduct of the parties [before the controversy arose,] that the word was not used as a synonym for the word 'extend.'" *Lexington Flying Serv.*, 239 S.W.2d at 947.

Here, the relevant terms of the lease suggest that RDP Company (and its predecessors-in-interest) hold an option to extend. For example, the lease provides that RDP Company's option is on the same "terms and for the same consideration" as the original lease. R. 81-4 at 14. No material term is left open, in which case a new signed writing capturing all material terms (*e.g.*, a renewal) would be required. *Cf. Camelot LLC v. AMC ShowPlace Theatres, Inc.*, 665 F.3d 1008, 1010 (8th Cir. 2012) ("If terms have deliberately been left open, the parties have an option to renew and the terms must be renegotiated for a binding contract to exist." (citing *King v. Dalton Motors, Inc.*, 109 N.W.2d 51, 52–53 (Minn. 1961))).

While the Storys maintain that, by conditioning the option to prolong the lease on the lessee's performance of "all [of its] stipulations, covenants and agreements," the parties intended to confer a right of renewal, R. 78-1 at 9 (quoting R. 81-4 at 14), the

Court is not so sure.  The presence of a condition precedent to the exercise of an option to prolong a lease does not, in of itself, mean that the corresponding right must be of renewal.  Instead, "if the lease prescribes a condition precedent to the exercise of the privilege by the lessee, . . . *whether the privilege be one 'to renew' or 'to extend' the original term* . . . such condition must be complied with, or it must be waived by the lessor"—nothing more, nothing less.  *Klein*, 234 S.W. at 215 (emphasis added).  There is nothing anomalous about conditioning an option to extend on the satisfaction of some term or the performance of some particular act.  *See Edwards-Pickering Co. v. Rodes*, 261 S.W. 884, 886–87 (Ky. 1924).

Lastly, the parties' conduct contemplates an option to extend the lease.  From 1982 through 2012, the parties never signed any document purporting to prolong the 1977 lease, and the Storys didn't ask to either.  Instead, the Storys cashed each royalty check sent to them for over thirty-five years.  *See* R. 77-3 at 169; R. 77-6 at 39.  Throughout that time period, the parties treated the 1977 lease as a binding agreement.

The Storys claim that the parties' conduct reveals that a separate, formal lease agreement is necessary to prolong the lease term.  *See* R. 78-1 at 10.  To arrive at that conclusion, the Storys characterize the 1977 lease as a written renewal of the 1972 lease, and the 1972 lease as a written renewal of the 1967 lease.  *See id.*  Since the parties required written renewals then, the Storys say, the parties must have meant to prolong the lease term only if a written renewal was executed.  *See id.*

The "prior execution of a signed agreement to renew a lease," it is true, tends to show that "a covenant to renew . . . required a writing."  *1651 N. Collins Corp.*, 529 F. App'x at 634 (quoting *Tinaco Plaza, LLC v. Freebob's, Inc.*, 814 A.2d 403, 410 (Conn.

14

App. Ct. 2003), *cert. granted*, 819 A.2d 840 (Conn. 2003), *and cert. dismissed*, No. 16970 (Conn. Feb. 4, 2004)).  The 1977 lease is not, however, a "written renewal" of the 1972 lease.  While the 1972 lease contained an option to "renew" on the same "terms and for the same consideration" as the original lease, R. 81-4 at 4, the 1977 lease differed from the 1972 lease in almost every material respect:  The 1977 lease completely altered the formula for calculating production royalties, omitted a minimum acreage royalty, added a right to fifteen tons agricultural lime annually, and set 2076 as outer mark for prolonging the lease term.  *Compare id.* at 1–5, *with id.* at 12–15; *see also* R. 89 at 6–7 (RDP Company's Response).  Properly described, the 1977 lease is a separate and independent agreement.  *See Alabama Farmers Co-op., Inc. v. Jordan*, 440 F. App'x 463, 467 (6th Cir. 2011) ("The 2000–2005 lease—not signed until sometime in 2001—could not reasonably be deemed a 'renewal' of the 1995–2000 lease because the second lease contained different terms—namely, an increase in the price of purchase option . . . .").  Since the 1977 lease stands apart from the 1972 lease, the parties' conduct as to *that* lease is most probative of what the parties intended.

To summarize, though the lease uses the term "renew," the parties' intent as manifested in other terms of the lease and the parties' conduct before the controversy arose point to a right to "extend" instead.  In other words, RDP Company need not "renew" the lease in writing.  Instead, the lease contemplates a right to extend the lease term by "well and truly" keeping and performing "all [of] the stipulations, covenants and agreements" in the lease.  R. 81-4 at 14.

**2.**

Even if RDP Company had an option to extend the lease, though, the Storys argue that RDP Company failed to satisfy the conditions precedent to exercising that right. *See* R. 78-1 at 11–21; R. 98 at 9–13; R. 99 at 6–13. Said differently, the Storys maintain that RDP Company has not "well and truly kept and performed . . . all the stipulations, covenants and agreements" in the lease. R. 81-4 at 14. While the Storys point to four alleged breaches in support of that proposition, none show promise.

**a.**

In the absence of factual disputes, "the construction and interpretation of a contract, including questions regarding ambiguity, are questions of law" for the Court to decide. *Frear v. P.T.A. Indus., Inc.*, 103 S.W.3d 99, 105 (Ky. 2003) (quoting *First Commonwealth Bank of Prestonsburg v. West*, 55 S.W.3d 829, 835 (Ky. Ct. App. 2000)). The primary object when construing a contract, such as the lease of limestone here, is to give effect to the parties' intent. *See Baker v. Magnum Hunter Prod., Inc.*, 473 S.W.3d 588, 592 (Ky. 2015); *see also Coffey v. Kehoe Rock & Stone, LLC*, 270 S.W.3d 902, 904 (Ky. Ct. App. 2008) (seeing "no difference between the lease of limestone, as a mineral," and other mineral leases, such as "the lease of coal"). The contract must be examined as a whole, giving effect to "every word in it, if possible." *Morganfield Nat'l Bank v. Damien Elder & Sons*, 836 S.W.2d 893, 895 (Ky. 1992).

A contract is ambiguous "if a reasonable person would find it susceptible to different or inconsistent interpretations." *Hazard Coal Corp. v. Knight*, 325 S.W.3d 290, 298 (Ky. 2010) (quoting *Cantrell Supply, Inc. v. Liberty Mut. Ins. Co.*, 94 S.W.3d 381, 385 (Ky. Ct. App. 2002)); *see also Cent. Bank & Tr. Co. v. Kincaid*, 617 S.W.2d 32, 33

(Ky. 1981) (defining an ambiguous contract as one "capable of more than one different, reasonable interpretation"). Where a contract is unambiguous, the Court looks "only as far as the four corners of the document" to determine the parties' intent. *Abney v. Nationwide Mut. Ins. Co.*, 215 S.W.3d 699, 703 (Ky. 2006) (citing *3D Enters. Contracting Corp. v. Louisville & Jefferson Cty. Metro. Sewer Dist.*, 174 S.W.3d 440, 448 (Ky. 2005)), *as modified on denial of reh'g* (Ky. Mar. 22, 2007). If not, however, the Court will resort to extrinsic evidence "involving the circumstances surrounding the execution of the contract, the subject matter of the contract, the objects to be accomplished, and the conduct of the parties." *Cantrell Supply, Inc.*, 94 S.W.3d at 385 (citing *Reynolds Metals Co. v. Barker*, 256 S.W.2d 17, 18 (Ky. 1953); *Dennis v. Watson*, 264 S.W.2d 858, 860 (Ky. 1953); *L.K. Comstock & Co. v. Becon Constr. Co.*, 932 F. Supp. 948, 965 (E.D. Ky. 1993), *aff'd per curiam*, 73 F.3d 362 (6th Cir. 1995) (unpublished table decision)); *accord Journey Acquisition-II, L.P. v. EQT Prod. Co.*, 39 F. Supp. 3d 877, 887 (E.D. Ky. 2014), *aff'd*, No. 15-5966, ——— F.3d ——— (6th Cir. 2016).

### b.

The Storys allege that the "most egregious breach" of the lease has been the use of Story tract in conjunction with quarrying operations on other adjacent properties. R. 78-1 at 13. While pleaded as a breach of contract and as an unjust enrichment claim, *see* R. 47 at 10–11, 13, ¶¶ 33–37, 43–44, RDP Company points out that the Storys' claim really sounds in tort as an action for trespass, *see* R. 89 at 8–9. On that point, the Storys make no response, and RDP Company appears to be correct. *See Wright v. Carrollton Gravel & Sand Co.*, 242 S.W.2d 751, 752–53 (Ky. 1951) (describing cause of action for depositing spoils and maintaining stockpiles on landlord's land as a trespass);

*Carmichael v. Old Straight Creek Coal Corp.*, 22 S.W.2d 572, 575–76 (Ky. 1929) (describing actions taken in excess of use allowed under lease to be a trespass). Consequently, the Court will construe the Storys' allegations on this score as a claim for trespass—not for breach of contract.

### c.

Next, the Storys maintain that RDP Company breached its obligation to pay the production royalty under the lease. The lease calls for a production royalty on all merchantable limestone and kindred substances removed and quarried in any particular month to be paid the following month. *See* R. 81-4 at 13–14. The Storys claim that RDP Company breached that provision in two ways. First, the Storys argue, RDP Company must pay royalties on "boulders" the month after those boulders are dislodged in the blasting process—not when Lafarge West processes them through the primary crusher. *See* R. 78-1 at 20. Second, the Storys allege that RDP Company used an unknown amount of limestone and other kindred substances to construct the bases of various haul roads and buildings without paying royalties. *See id.* at 21. The Court finds neither argument availing.

### i.

As RDP Company and Lafarge West are quick to point out, the Storys' third amended complaint makes no mention of any breach of contract claim akin to the theories that the Storys offer now. *See* R. 89 at 14–15; R. 93 at 13 n.8 (Lafarge West's Response). The Court agrees: Neither claim is properly before the Court.

An evaluation of the scope of a party's claim at the summary judgment stage "amounts to a decision of the sufficiency of a pleading, which is a question of law" for

the Court to decide. *Carter v. Ford Motor Co.*, 561 F.3d 562, 565 (6th Cir. 2009) (citing *Minadeo v. ICI Paints*, 398 F.3d 751, 756 (6th Cir. 2005)). The key issue in a challenge to the sufficiency of a pleading is notice. *Id.* at 565–66; *see also Kurtz v. McHugh*, 423 F. App'x 572, 579 (6th Cir. 2011). The Federal Rules of Civil Procedure provide "for liberal notice pleading at the outset of the litigation because '[t]he provisions for discovery are so flexible' that by the time a case is ready for summary judgment, 'the gravamen of the dispute [has been] brought frankly into the open for inspection by the court.'" *Tucker v. Union of Needletrades, Indus. & Textile Emps.*, 407 F.3d 784, 788 (6th Cir. 2005) (alterations in original) (quoting *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 512–13 (2002)). But the "nature of the notice requirement is much more demanding at the summary judgment stage than at earlier stages of the litigation, because by this point a plaintiff has had the opportunity to conduct discovery and to amend the complaint to reflect new theories." *Desparois v. Perrysburg Exempted Vill. Sch. Dist.*, 455 F. App'x 659, 665 (6th Cir. 2012) (citing *Tucker*, 407 F.3d at 787–88). With limited exception, then, a party may not raise new claims or assert new legal theories during the summary judgment stage. *See Bridgeport Music, Inc. v. WM Music Corp.*, 508 F.3d 394, 400 (6th Cir. 2007) (citing *Harvey v. Great Seneca Fin. Corp.*, 453 F.3d 324, 329 (6th Cir. 2006); *Tucker*, 407 F.3d at 788; *Mich. Bell Tel. Co. v. Strand*, 305 F.3d 580, 589–90 (6th Cir. 2002)).

Here, the Storys attempt to do just that, and it is hard to say that RDP Company or Lafarge West had sufficient notice. The only allegation in the Storys' third amended complaint is that RDP Company "has paid the rent or production royalty due . . . based upon the amount of tonnage sold rather than based upon the tonnage of 'merchantable

limestone and kindred substances' 'removed' and 'quarried' as required by" the lease. R. 47 at 6–7, ¶ 21. The Storys' complaint makes no reference to the timing of payment concerning the "boulders," or to the nonpayment of royalties for unmerchantable waste rock, as possible breaches of contract, *see id.* at 8–17, ¶¶ 27–59, and "contains little in the way of 'supporting facts'" that might have provided some warning to RDP Company or Lafarge West, *Carter*, 561 F.3d at 566. Despite ample opportunity, *see* R. 17 at 1 (Order of November 11, 2014); R. 45 at 1 (Order of June 4, 2015), the Storys never added allegations of that ilk to their pleadings. With this litigation now in the eleventh hour, the Storys cannot expand their claims to include these new legal theories. *Cf. Henderson v. Chrysler Grp., LLC*, 610 F. App'x 488, 494 (6th Cir. 2015); *Renner v. Ford Motor Co.*, 516 F. App'x 498, 504 (6th Cir. 2013); *Desparois*, 455 F. App'x at 666.

**ii.**

Even if the Storys could, though, neither theory goes anywhere on the merits. First, a boulder too large to process without the aid of a secondary breaker has not been "removed" and "quarried" as contemplated under the lease. *See* R. 81-4 at 13–14; *see also* R. 96 at 3 (RDP Company's Reply). Instead, the obligation to remit a production royalty becomes due under the lease only after the boulders are quarried to a reasonable size. It is commercially unreasonable to read the lease as requiring otherwise.

Second, there is no evidence that RDP Company or Lafarge West cart off merchantable limestone and other kindred substances for internal use without paying the appropriate royalty. It is true that Lafarge West constructs its quarry roads from both merchantable limestone and unmerchantable waste rock. *See* R. 81-7 at 7; R. 81-8 at 31–32. However, it is undisputed that Lafarge West weighs all merchantable limestone, and

pays the royalty due, before putting it to internal use. *See* R. 81-8 at 31–32. Though the Storys complain that the waste rock has "some value because it was used" to construct haul roads, R. 78-1 at 21, the fact that Lafarge West extracted marginal value from putting the waste rock to use does not transform that waste into merchantable limestone or other kindred substances, *see* R. 96 at 3–4. In short, there is no record evidence of RDP Company failing to remit any royalty due under the lease.[3]

### d.

In addition, the Storys argue that RDP Company breached the lease when it (or Lafarge West) "routinely destroyed" timber on the Storys' tract. *See* R. 78-1 at 20; R. 91 at 16 (Response to RDP Company); R. 92 at 15 (Response to Lafarge West). The Storys' position is without support. True enough, the lease reserved to the Storys the "right to all timber cut by [the quarry operator] on the premises during the course of operation." R. 81-4 at 14. The record reveals a single incident where timber was felled on the Storys' land. In 2013, Mark Champion, the Quarry Manager for Lafarge West, advised Charles that Lafarge West would be expanding its operations into an area of the Story tract containing twelve oak trees. *See* R. 77-3 at 94, 96. Champion told Charles that if he wanted the timber, he needed to harvest it within a certain time period. *See id.* at 86–88. Despite that conversation, Charles simply could not find the time to cut the trees, and so Lafarge West cleared the area. *See id.* at 94–95. Those facts do not give rise to an actionable breach of contract claim.[4]

---

[3] Since RDP Company has paid all royalties promised to the Storys, the Storys are not entitled to declare a forfeiture under the terms of the lease. *See* R. 47 at 9–10, ¶¶ 30–32 (Third Amended Complaint); *see also* R. 81-4 at 14 (1977 Lease).

[4] The Storys also maintain that RDP Company and Lafarge West committed statutory waste by felling timber on the property. *See* R. 78-1 at 20 (Memorandum in Support of Storys' Motion for Summary Judgment); R. 91 at 16 (Response to RDP Company); R. 92 at 15 (Response to Lafarge West). "Waste" is

**e.**

Though the Storys say that RDP Company has not delivered the fifteen tons of agricultural lime as provided for in the lease, *see* R. 47 at 13, ¶ 44, that argument is of no moment. It would seem as though the Storys abandoned the claim altogether, since RDP Company addressed that point in its briefing, *see* R. 77-1 at 22–23 (Memorandum in Support of RDP Company's Motion for Summary Judgment), and the Storys make no response. In any event, though, the lease obligates RDP Company to deliver fifteen tons of agricultural lime per year "at the Quarries." R. 81-4 at 14. It is undisputed that whenever the Storys requested the agricultural lime, it was made available for them at the quarry. *See* R. 77-3 at 100–01. Consequently, there is no breach.

**3.**

In summary, RDP Company has not defaulted under the terms of the lease between it and the Storys. RDP Company has extended the term of the lease by "well and truly kep[ing] and perform[ing] . . . all the stipulations, covenants and agreements"

---

any act "done by a tenant without license or authority from his landlord, whereby a lasting damage is done to the freehold." *Calvert v. Rice*, 12 Ky. L. Rptr. 252, 254 (1890) (quoting *Loudon v. Warfield*, 28 Ky. 196, 196 (1830)). Under Kentucky's codification of the ancient common-law doctrine of waste,

> If any tenant for life or years commits waste during his estate or term, of anything belonging to the tenement so held, *without special written permission to do so*, he shall be subject to an action of waste, shall lose the thing wasted, and pay treble the amount at which the waste is assessed.

Ky. Rev. Stat. § 381.350 (emphasis added); *see also Salyer's Guardian v. Keeton*, 283 S.W. 1015, 1018 (Ky. 1926) (recounting history of common-law and statutory waste).

As discussed earlier, the record reveals just a single incident where timber was felled on the Storys' land, *see* R. 77-3 at 86–88, 94–96 (Charles Story's Deposition Excerpt), something the lease expressly allows RDP Company and Lafarge West to do, *see* R. 81-4 at 14. When a party "consents in writing to actions that he later claims to be waste, he cannot recover under the waste statute." *Cornett v. Magnum Hunter Prod., Inc.*, No. 13-145-GFVT, 2014 WL 1338708, at *4 (E.D. Ky. Mar. 31, 2014); *cf. Abel v. Wuesten*, 136 S.W. 867, 867 (Ky. 1911) ("[A] special license in writing is necessary in order to authorize the tenant for life or years to commit waste, and without such special license in writing he is subject to an action of waste."). Therefore, the Storys' statutory waste claim is likewise of no consequence.

contained therein.  R. 81-4 at 14.  It may extend the lease through July 31, 2076, should it continue to do the same.

## B.

In the alternative, the Storys maintain that the lease constituted an unconscionable contract unenforceable under Kentucky law when signed in 1977.  *See* R. 78-1 at 23–25; R. 99 at 13–14.   Though only "used in rare instances, such as when a party abuses its right to contract freely," *Forsythe v. BancBoston Mortg. Corp.*, 135 F.3d 1069, 1074 (6th Cir. 1997) (citing *Louisville Bear Safety Serv., Inc. v. S. Cent. Bell Tel. Co.*, 571 S.W.2d 438, 439 (Ky. Ct. App. 1978)), the doctrine of unconscionability is "one of the grounds upon which any contract may be revoked," *Energy Home, Div. of S. Energy Homes, Inc. v. Peay*, 406 S.W.3d 828, 835 (Ky. 2013) (citing *AT & T Mobility LLC v. Concepcion*, 131 S. Ct. 1740, 1747 (2011); *Schnuerle v. Insight Commc'ns Co.*, 376 S.W.3d 561, 575 (Ky. 2012); *Conseco Fin. Servicing Corp. v. Wilder*, 47 S.W.3d 335, 341 (Ky. Ct. App. 2001)).   "An unconscionable contract is 'one which no man in his sense, not under delusion, would make, on the one hand, and which no fair and honest man would accept, on the other.'"  *Schnuerle*, 376 S.W.3d at 575 (quoting *Louisville Bear Safety Serv., Inc.*, 571 S.W.2d at 440).

Unconscionability comes in two flavors: procedural and substantive.  *Energy Home*, 406 S.W.3d at 835; *accord In re Merv Properties, L.L.C.*, 539 B.R. 516, 531 (B.A.P. 6th Cir. 2015).  "Procedural unconscionability relates to the process by which an agreement is reached and to the form of the agreement."  *Id.* (citing *Schnuerle*, 376 S.W.3d at 576–77).  It includes, for example, "the use of fine or inconspicuous print and convoluted or unclear language that may conceal or obscure a contractual term."  *Energy*

*Home*, 406 S.W.3d at 835 (citing *Schnuerle*, 376 S.W.3d at 576–77). When evaluating whether a contract is procedurally unconscionable, the Court ought to consider factors such as "the bargaining power of the parties, 'the conspicuousness and comprehensibility of the contract language, the oppressiveness of the terms, and the presence or absence of a meaningful choice.'" *Schnuerle*, 376 S.W.3d at 576 (quoting *Jenkins v. First Am. Cash Advance of Ga., LLC*, 400 F.3d 868, 875–76 (11th Cir. 2005)). "Substantive unconscionability refers to contractual terms that are unreasonably or grossly favorable to one side and to which the disfavored party does not assent." *Energy Home*, 406 S.W.3d at 835 (citing *Schnuerle*, 376 S.W.3d at 577). Factors relevant to the substantive unconscionability inquiry include "the commercial reasonableness of the contract terms, the purpose and effect of the terms, the allocation of the risks between the parties, and similar public policy concerns." *Id.* (quoting *Schnuerle*, 376 S.W.3d at 577).

Here, the Storys argue that the third lease is unconscionable—both on procedural and substantive grounds. *See* R. 78-1 at 23–24; R. 99 at 13–14. The Storys had no meaningful choice when signing the third lease—or so the argument goes—because Fredonia Valley Quarries misrepresented its right to extend the term of the second lease in the event that the Storys refused. *See* R. 78-1 at 24–25; R. 99 at 13–14; *see also* R. 78-5 at 1 (Letter from R.W. Waskom to the Storys). With that proposition, the Court disagrees.

Fredonia Valley Quarries made no misrepresentation. Though "perpetual leases are not favored in the law," such provisions are "acceptable under limited conditions." *Farris v. Laurel Explosives, Inc.*, 797 S.W.2d 487, 489 (Ky. Ct. App. 1990). Where the "intention to create a right of renewal in perpetuity is clearly and unambiguously

expressed, the obligation so created is valid and enforceable." *Vokins v. McGaughey*, 566 S.W. 907, 909 (Ky. 1924) (quoting 35 C.J. 1017, ¶ 144).

In this case, the second lease included the following provision:

> It is mutually agreed by the parties hereto that this lease shall run for five years from and after this date, and that if all the stipulations, covenants and agreements herein contained have been well and truly kept and performed by the [lessee] as herein provided, this lease may be renewed according to the terms hereof and for the same consideration for five additional years and at intervals of five years hereafter so long as said conditions have been kept and performed.

R. 81-4 at 9. The language employed clearly and unambiguously indicates that the parties' contemplated more than one renewal. *See Vokins*, 266 S.W. at 909. Otherwise, the clause allowing for a renewal "for five additional years *and at intervals of five years hereafter*" would carry no meaning. R. 81-4 at 9 (emphasis added). Consequently, Fredonia Valley Quarries accurately represented its right to extend the second lease.

Regardless, though, the circumstances surrounding the execution of the third lease simply do not support a finding of either procedural or substantive unconscionability. Taking as true the Storys' assertion that the third lease was "presented as a 'take it or leave it' option," such circumstances did not make "acceptance compulsory." *Energy Home*, 406 S.W.3d at 836. Under Kentucky law, adhesion contracts are "not *per se* unconscionable." *Id.* (citing *Schnuerle*, 376 S.W.3d at 576). In short, there was neither a lack of meaningful choice, nor anything commercially unreasonable about the third lease, as to make it an unconscionable agreement.

## C.

Regardless of the situation in 1977, though, the Storys argue that the third lease has become unconscionable over time because the royalty paid to them has remained constant, even though the price of limestone in the area has ostensibly risen since 1977.

*See* R. 78-1 at 25–30; R. 99 at 14–15. The Storys take the position that the Kentucky Supreme Court would endorse the view that a contract may become unconscionable over time based upon changed circumstances. *See* R. 78-1 at 25–30; R. 99 at 14–15. They urge the Court to follow the Kentucky Court of Appeals' holding to that effect in *Kentucky West Virginia Gas Co. v. Interstate Natural Gas Co.*, Nos. 1998-CA-001460-MR, 1998-CA-001953-MR, 1998-CA-002036-MR, 1998-CA-002037-MR, 1998-CA-002038-MR, 1998-CA-003186-MR, 1999-CA-000186-MR (Ky. Ct. App. June 9, 2000) (unpublished), *as modified on denial of reh'g* (Ky. Ct. App. Aug. 25, 2000), *discretionary review denied*, Nos. 2000-SC-000847-D, 2000-SC-000862-D (Ky. Aug. 15, 2001), as that decision "removes any doubt" as to how Kentucky would resolve the issue, R. 78-1 at 27. The Court rejects that argument.

Because the Court's jurisdiction over this case rests on the diversity of the parties, *see* 28 U.S.C. § 1332, this Court applies Kentucky law as enunciated by the Kentucky Supreme Court, *see Tooling, Mfg. & Techs. Ass'n v. Hartford Fire Ins. Co.*, 693 F.3d 665, 670 (6th Cir. 2012). Absent a controlling decision on the relevant issue, the Court must try to predict how the Kentucky Supreme Court would resolve the question. *See Heil Co. v. Evanston Ins. Co.*, 690 F.3d 722, 731 (6th Cir. 2012). In doing so, the Court looks to "the decisions (or dicta) of the Kentucky Supreme Court in analogous cases, pronouncements from other Kentucky courts, restatements of law, commentaries, and decisions from other jurisdictions." *State Auto Prop. & Cas. Ins. Co. v. Hargis*, 785 F.3d 189, 195 (6th Cir. 2015) (citing *Combs v. Int'l Ins. Co.*, 354 F.3d 568, 577 (6th Cir. 2004); *Garden City Osteopathic Hosp. v. HBE Corp.*, 55 F.3d 1126, 1130 (6th Cir. 1995); *Bailey v. V & O Press Co.*, 770 F.2d 601, 604 (6th Cir. 1985)). The Court should

follow the opinions—published or not—of the Kentucky Court of Appeals unless persuaded that the Kentucky Supreme Court would decide the issue otherwise. *See Ziegler v. IBP Hog Mkt., Inc.*, 249 F.3d 509, 517 (6th Cir. 2001).

The Court predicts that Kentucky Supreme Court would not endorse the view that a contract may become unconscionable over time based upon changed circumstances. Under the general and long-standing rule, "the unconscionability of a contract or term is considered in light of circumstances 'at the time the contract is made.'" *Neely v. Consol Inc.*, 25 F. App'x 394, 401 (6th Cir. 2002) (quoting Restatement (Second) of Contracts § 208 (1979)). The rationale behind measuring unconscionability at the time of contract formation is sound:

> [V]irtually all contracts involve the assessment of risks. How fast, if at all, will land values rise over the next ten years? Are interest rates likely to increase, decrease, or remain constant? Is a particular venture likely to be a wild success or an abysmal failure? What is the probability of a debtor[] not repaying his debt? What collateral is necessary as security to protect against the debtor's possible failure to repay? Assessment of such risks is intrinsic to the process of contracting and affects the terms on which contracts are entered into.

> To judge the substantive fairness of contracts at a date subsequent to their making could nullify many contracts entailing a speculative element. Option to purchase agreements, for instance, might prove particularly difficult to enforce. Contingency fee contracts would be suspect if the part contracting for the free achieved unexpectedly beneficial results. Home mortgages executed at low interest rates prevent in the late 1950's might, in the light of hindsight, today be considered unconscionable in substantive terms.

*Res. Mgmt. Co. v. Weston Ranch & Livestock Co.*, 706 P.2d 1028, 1043 (Utah 1985). A number of jurisdictions subscribe to the traditional view. *See, e.g.*, *Kenyon Ltd. P'ship v. 1372 Kenyon St. Nw. Tenants' Ass'n*, 979 A.2d 1176, 1186 (D.C. 2009) ("Whether a contract term is unconscionable is determined as of the time the contract is made."); *Stern v. Cingular Wireless Corp.*, 453 F. Supp. 2d 1138, 1144 (C.D. Cal. 2006) ("Under

California law, '[t]he critical juncture for determining whether a contract is unconscionable is the moment when it is entered into by the parties—not whether it is unconscionable in light of subsequent events.'" (alteration in original) (quoting *Am. Software, Inc. v. Ali*, 54 Cal. Rptr. 2d 477, 480 (Cal. Ct. App. 1996))); *Best v. U.S. Nat'l Bank of Ore.*, 739 P.2d 554, 556 (Ore. 1987) ("Unconscionability is a legal issue that must be assessed as of the time of contract formation." (citing *W. L. May Co. v. Philco-Ford Corp.*, 543 P.2d 283, 286 (Ore. 1975))); *Bos. Helicopter Charter, Inc. v. Agusta Aviation Corp.*, 767 F. Supp. 363, 375 (D. Mass. 1991) ("The relevant consideration is the circumstances at the time the contract was made, and not the circumstances as they later developed." (citing *Zapatha v. Dairy Mart, Inc.*, 408 N.E.2d 1370, 1375 (Mass. 1980))). In light of those authorities, the Court does not find *Kentucky West Virginia Gas Co.* to be persuasive.

Even if the Kentucky Supreme Court recognized that a contract may become unconscionable over time based upon changed circumstances, though, there is no reason to say that the third lease is unconscionable now. In the main, the Storys point to nothing demonstrating that the lease has become commercially unreasonable. For example, the Storys have not introduced any proof as to the "current market rates being paid to similarly-situated landowners," or "how the rate paid to the Storys is 'unconscionably' out of line with those rates." R. 77-1 at 32. Instead, the Storys rely solely on the fact that RDP Company receives a royalty of 30.33¢ per ton of limestone mined until April 30, 2007, followed by a royalty of 30.33¢ per ton, or 4.5% of Martin Marietta's weighted average retail price per ton, whichever is greater, until April 30, 2027. *See* R. 78-1 at 29 (citing R. 78-13 at 9–10, § 3.2)). Yet, the Storys ignore the fact that RDP Company's

royalty represents the purchase price not simply of raw limestone, but of a quarrying business—one into which RDP Company invested millions of dollars for more than a decade. *See* R. 77-1 at 33–34. Without any proper comparators, there is simply no factual basis for the Storys' unconscionability claim.

## D.

Lastly, the Storys claim that RDP Company and its successors-in-interest have exceeded their rights under the lease by using the Storys' property in conjunction with quarrying operations on adjacent lands. *See* R. 78-1 at 13–18; R. 98 at 9–10. RDP Company concedes it has used the Story tract in such a manner, *see* R. 77-1 at 16, but it suggests that the alleged trespass has persisted long enough so as to create a prescriptive easement, *see* R. 77-1 at 16–18; R. 89 at 8–11; R. 96 at 4–5. On that point, RDP Company is right.

The right to acquire an easement by prescription is of ancient origin, grounded in the common law and principals of adverse possession. *Columbia Gas Transmission Corp. v. Consol of Ky., Inc.*, 15 S.W.3d 727, 730 (Ky. 2000). In order to obtain a right to a prescriptive easement, a claimant's use of the property must be "actual, hostile, open and notorious, exclusive, and continuous . . . for the statutory period of fifteen years." *Id.* (citing Ky. Rev. Stat. § 413.0110; *Riggs v. Ketner*, 187 S.W.2d 287 (Ky. 1945); *Riley v. Jones*, 174 S.W.2d 530, 531, 532 (Ky. 1943); *Pickel v. Cornett*, 147 S.W.2d 381, 382 (Ky. 1941)); *see also Poe v. Gaunce*, 371 S.W.3d 769, 774–75 (Ky. Ct. App. 2011). The acts necessary to acquire an easement by prescription vary with the nature of the interest to be possessed. *See Riley*, 174 S.W.2d at 532. "Continuous, uninterrupted use . . . without interference for [fifteen] years or more raises a presumption the use was under a

claim of right and the burden shifts to the opposing landowner to present evidence to rebut the presumption showing it was merely permissive." *Cole v. Gilvin*, 59 S.W.3d 468, 475 (Ky. Ct. App. 2001) (citing *Ward v. Stewart*, 435 S.W.2d 73, 75 (Ky. 1968); *Finney v. Deweese*, 252 S.W.2d 6 (Ky. 1952); *Lyle v. Holman*, 238 S.W.2d 157, 160 (Ky. 1951)).

Here, RDP Company has used the Story tract in connection with quarrying operations on adjacent lands for far more fifteen years. Some twenty to twenty-five years ago, Charles Story witnessed the construction of various haul roads, which he knew were used to support quarrying operations on adjacent lands, on the Story tract. *See* R. 77-3 at 75–77. Around the same time, Charles noticed the quarry operator stockpiling topsoil and depositing waste rock extracted from adjacent properties on his land too. *See id.* at 66–72. The Storys complained about to RDP Company about that use around 1990. *See id.* at 68–72, 77. Yet, an RDP Company representative responded by claiming a right to use the Story tract as it wished, *see id.* at 78, and it has done so to the present day. These undisputed facts establish that RDP Company has a prescriptive easement to use the Story tract in conjunction with its operations on other lands, limited, of course, to the form and nature of use during the prescriptive period. *See Lyle*, 238 S.W.2d at 159–60.

The Storys argue that RDP Company entered onto the Story tract under the terms of the lease, and as such, it cannot acquire a prescriptive easement. *See* R. 99 at 6–7. Generally speaking, it is true that a right to use property, if permissive at its inception, will not ripen into a prescriptive easement. *See McCoy v. Hoffman*, 295 S.W.2d 560, 561 (Ky. 1956); *Cole*, 59 S.W.3d at 475–76. To that statement, though, there is an important caveat: A prescriptive easement may ripen so long as the claimant makes some positive

assertion of right to put the landowner on notice of its claim. *See Lambert v. Huntsman*, 209 S.W.2d 709, 711 (Ky. 1948); *Clark v. Cunning*, 196 S.W.2d 609, 611 (Ky. 1946). Here, RDP Company placed the Storys on notice by claiming a right to use the Story tract as it wished. *See* R. 77-3 at 78. In light of that fact, nothing prohibited RDP Company from acquiring a prescriptive easement. *Cf. Grannes v. Red Cedar of Yellow Medicine, Inc.*, No. A04-1264, 2005 WL 949059, at *3 (Minn. Ct. App. Apr. 26, 2005).[5]

## VI.

The Storys' Motion for Summary Judgment, R. 78, is **DENIED**. RDP Company's Motion for Summary Judgment, R. 77, Martin Marietta Materials, Inc.'s Motion for Summary Judgment, R. 79, and Lafarge West, Inc.'s Motion for Summary Judgment, R. 81, are **GRANTED**. RDP Company's Motion to Strike, R. 73, and Lafarge West, Inc.'s Motion to Strike, R. 75, and Martin Marietta Materials, Inc.'s Motion for Extension of Time, R. 80, are **DENIED AS MOOT**.

An appropriate order shall issue separate from this Memorandum Opinion.

Date:

cc:      Counsel of Record

---

[5] Because RDP Company has a prescriptive easement, summary judgment as to the Storys' willful-trespass claim, *see* R. 47 at 17–18, ¶¶ 57–59, is appropriate too.